**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
Sheldon L. Pollock
Steven G. Rawlings
Daniel Loss
Megan R. Genet
Tiantong Wen
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
(212) 336-5571 (Loss)
lossd@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　　　　　Plaintiff,<br><br>　　　-against-<br><br>SCOTT J. HOLLENDER,<br>GABRIEL F. MIGLIANO, JR. and<br>FRANK M. VECCHIO,<br><br>　　　　　　　　　Defendants,<br><br>　　　-and-<br><br>GSH EMPIRE, INC. and<br>21ST CENTURY GOLD & SILVER INC.,<br><br>　　　　　　　　　Relief Defendants. | **COMPLAINT**<br><br>23 Civ. _____ (　　)<br><br>**JURY TRIAL DEMANDED** |

　　　　Plaintiff Securities and Exchange Commission ("SEC" or "Commission"), for its Complaint against Defendants Scott J. Hollender ("Hollender"), Gabriel F. Migliano, Jr. ("Migliano") and Frank M. Vecchio ("Vecchio") (collectively, "Defendants") and Relief Defendants GSH Empire, Inc. ("GSH Empire") and 21st Century Gold & Silver Inc. ("21st Century"), alleges as follows:

**SUMMARY**

1. This matter concerns fraudulent and unregistered broker activity by Hollender, Migliano, and Vecchio. Defendants were among a network of sales agents hired by StraightPath Venture Partners (the "SP Fund Manager") to solicit investments in private funds (the "SP Funds") that purportedly owned shares of private companies that had prospects of "going public" ("Pre-IPO Shares").

2. Between approximately November 2017 and November 2021, Hollender, Migliano, and Vecchio successfully solicited a combined total of at least $13 million in SP Fund investments from at least 115 investors. To pitch investors on the SP Funds, Defendants falsely and misleadingly represented that there were no upfront fees associated with their investments and that Defendants would only make money through a fee charged on an investor's profits after the relevant company went public. In fact, however, Hollender, Migliano, and Vecchio each received upfront commissions of approximately 10 percent on the investments they successfully solicited.

3. Additionally, while receiving millions of dollars in transaction-based compensation and advising investors on the putative merits of investments in the SP Funds – hallmarks of broker activity – Defendants were neither registered with the Commission as broker-dealers nor affiliated with any Commission-registered broker-dealer in violation of the federal securities laws.

**VIOLATIONS**

4. By virtue of the foregoing conduct and as alleged further herein, Defendants Hollender, Migliano, and Vecchio have violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Sections 10(b) and 15(a) of the Securities Exchange Act of

1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78o(a)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

5. Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

6. The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

7. The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to disgorge all ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) ordering GSH Empire and 21st Century to pay, with prejudgment interest, all ill-gotten gains by which they were unjustly enriched, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

9.      Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

10.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].  Defendants may be found in, are inhabitants of, or transact business in the Southern District of New York, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including the solicitation of investors and the receipt of investor funds.  For example, from 2017 until 2021, the primary office for the SP Fund Manager and StraightPath Management LLC (the "SP Adviser"), out of which Hollender and Migliano worked, was located in this District.

**DEFENDANTS**

11.     **Hollender**, age 48, resides in Staten Island, New York.  Hollender was and is the 90 percent owner and control person of GSH Empire.  Hollender has not been associated with a Commission-registered broker-dealer since March 2010.  At various points in time between April 1997 and March 2010, Hollender was associated with three Commission-registered broker-dealers.  Between January 1995 and August 1999, Hollender also worked as a clerk at two Commission-registered broker-dealers.  Hollender has never held any securities licenses.

12.     **Migliano**, age 51, resides in Brooklyn, New York.  Migliano has not been associated with a Commission-registered broker-dealer since November 2014.  At various points in time between November 1995 and November 2014, Migliano was associated with five Commission-registered broker-dealers and held Series 4, 7, 63, and Securities Industry Essentials licenses.  Between 1999 and 2014, Migliano was the subject of 10 customer disputes alleging, among other things, unauthorized trading, failure to follow instructions, churning, suitability issues, and excessive trading.  In addition, in October 2003, Migliano consented to allegations, without admitting or

denying them, that he exercised control over the account of a customer and effected numerous securities transactions in this account using unsuitable levels of margin in a manner that was inconsistent with the customer's investment objectives and was suspended from association with any member of the National Association of Securities Dealers (the predecessor to FINRA) for one month, fined $5,000, and ordered to pay disgorgement in the amount of $22,508.

13.     **Vecchio,** age 66, resides in Delray Beach, Florida.  Vecchio has not been associated with a Commission-registered broker-dealer since March 2008.  At various points in time between January 1987 and March 2008, Vecchio was associated with at least twenty Commission-registered broker-dealers and held Series 7 and 63 licenses.  In December 2007, the National Futures Association ("NFA") issued a complaint charging Vecchio with making deceptive and misleading sales solicitations, to which Vecchio settled, without admitting or denying the allegations, by agreeing to never apply for NFA membership, associated NFA membership or principal status with any NFA member.  Based upon the same NFA complaint and Vecchio's offer of settlement thereto, in February 2010 the New Jersey Bureau of Securities revoked Vecchio's agent registration.  In testimony before the Commission during the investigation that preceded the filing of this action, Vecchio asserted his Fifth Amendment privilege against self-incrimination in response to questions relating to, among other things, his work on behalf of the SP Funds, his solicitation of investors for the SP Funds, his compensation from the SP Fund Manager, and his communications with the SP Fund Manager, SP Adviser, and persons related thereto.

## RELIEF DEFENDANTS

14.     **GSH Empire** was incorporated in New York in October 2018 with its principal place of business in Staten Island, New York.  The SP Fund Manager paid Hollender through GSH Empire for his sales of interests in the SP Funds.  Hollender was and is the 90 percent owner and control person of GSH Empire.

15.  **21st Century** was incorporated in Florida in October 2010 with its principal place of business in Boca Raton, Florida.  The SP Fund Manager paid Vecchio through 21st Century for his sales of interests in the SP Funds.  Vecchio was and is the sole owner and control person of 21st Century.

## RELEVANT INDIVIDUALS AND ENTITIES

16.  The **SP Fund Manager** is a Delaware limited liability company incorporated on May 11, 2017, which served as the owner and manager of each of the SP Funds.  From 2017 until mid-2021, the SP Fund Manager's office was in lower Manhattan; in mid-2021, it moved its office to Jupiter, Florida.  The SP Fund Manager has never been registered with the Commission as a broker-dealer.  The Commission previously sued the SP Fund Manager, SP Adviser, its founders, and its nominal manager (the "StraightPath Action Defendants") in a case captioned *SEC v. StraightPath Venture Partners LLC, et al.*, 22-cv-3897 (LAK) (S.D.N.Y. filed May 13, 2022).

17.  The **SP Adviser** is a Delaware limited liability company incorporated on May 11, 2017, which served as the investment adviser to each of the SP Funds and as the managing member of the SP Fund Manager.  Like the SP Fund Manager, the SP Adviser's office was in lower Manhattan until mid-2021, at which time it moved its office to Jupiter, Florida.  The SP Adviser has never been registered with the Commission as a broker-dealer.

## STATUTORY AND LEGAL FRAMEWORK

18.  Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)] requires securities brokers to register with the SEC or, if they are individuals, to be associated with a brokerage firm registered with the SEC.

19.  This registration requirement ensures that, among other things, brokers have adequate supervision and training before soliciting funds from investors for the purchase of securities.

20. While courts have recognized a number of factors that render a person a securities broker, the hallmarks of being a broker include actively soliciting investments (rather than passively obtaining them), providing advice as to the merits of an investment, being involved in negotiations between the issuer and the investor, and receiving transaction-based compensation, often in the form of a percentage of the funds raised for investments.

## FACTS

### I. Background

21. The SP Funds were investment vehicles that purportedly provided investors with the ability to invest in Pre-IPO Shares.

22. According to the offering documents, each SP Fund was a series limited liability company that was divided into segregated parts ("Series") in which investors could purchase interests. Each Series purportedly held a set number of Pre-IPO Shares, or rights to Pre-IPO Shares, of a particular company that had the prospect of engaging in an initial public offering ("IPO"). By purchasing interests in a particular Series, an investor could obtain a beneficial interest in a proportional number of the underlying Pre-IPO Shares held by the Series.

23. In practice, these investments were presented to investors as if the investors would be purchasing the underlying Pre-IPO Shares themselves.

24. For example, investors were quoted a price per share, investors would specify the number of shares they wished to own, and investors were told that their capital contribution reflected a number of shares at that price per share.

25. From November 2017 through February 2022, the StraightPath Action Defendants used a vast network of sales agents, including Defendants, to raise at least $410 million from more than 2,200 investors located across the country and around the world, including in this District.

26. The StraightPath Action Defendants paid their sales agents in at least two ways. First, the StraightPath Action Defendants paid sales agents an upfront commission equal to a percentage of the funds invested by an investor that the sales agent solicited.

27. In order to pay these upfront commissions, the StraightPath Action Defendants charged investors an undisclosed markup – the difference between the price the SP Fund Manager paid for the Pre-IPO Shares and the price at which the SP Fund Manager sold corresponding Series interests to investors.

28. The StraightPath Action Defendants also typically agreed to pay their sales agents a fee equal to a percentage of an investor's profits, if any, on the Pre-IPO Shares after an IPO (a "Backend Fee").

29. The SP Fund Manager typically documented both sets of commission arrangements using standardized written agreements.

**II.     Hollender and GSH Empire**

30. Hollender solicited investors on behalf of the SP Funds from in or around November 2017 through in or around August 2021 ("Hollender's Work Period").

31. In or around November 2017, Hollender began working part-time at the SP Fund Manager's offices in lower Manhattan. In or around December 2017 through March 2020, Hollender began working full-time at the SP Fund Manager's offices in lower Manhattan. During this time frame, the SP Fund Manager provided Hollender with a desk at its offices, a computer, a phone, and contact information for potential investors to solicit ("leads").

32. From March 2020 through in or around August 2021, Hollender continued to solicit investors in the SP Funds from his home, using a computer and leads provided to him by the SP Fund Manager.

33. From approximately November 13, 2017 through May 5, 2021, the SP Fund Manager also provided Hollender with an email address under the SP Fund Manager's email domain, which Hollender used to send and receive emails concerning his work for the SP Fund Manager. When Hollender sent emails from this email address, his signature block included the SP Fund Manager's lower Manhattan address and a New York phone number with a 646 area code.

34. The SP Fund Manager provided Hollender with business cards in or around December 2017 that included the SP Fund Manager's name, address, and phone number, as well.

35. On or around December 17, 2017, Hollender entered into a written agreement with the SP Fund Manager that stated he would receive a "10 percent front end referral fee" for any investor that he solicited that made an investment in the SP Funds (the "Hollender Agreement").

36. On or around October 31, 2018, Hollender incorporated GSH Empire for the purpose of receiving these upfront commissions from the SP Fund Manager for his sales of Series interests in the SP Funds.

37. On or around November 1, 2018, GSH Empire entered into an agreement with the SP Fund Manager entitling GSH Empire to a 5 percent Backend Fee for any investor that Hollender solicited that made an investment in one of the SP Funds (the "GSH Empire Agreement"). Hollender signed the GSH Empire Agreement on behalf of GSH Empire.

38. Notwithstanding the terms of the Hollender Agreement and the GSH Empire Agreement, in practice, during the entirety of Hollender's Work Period, the SP Fund Manager paid Hollender (at first personally and then, once GSH Empire was incorporated, through GSH Empire) a 10 percent upfront commission and a 10 percent Backend Fee on all investments solicited by Hollender.

39. Throughout Hollender's Work Period, the SP Fund Manager told Hollender which Pre-IPO Shares purportedly backed the interests in the SP Funds that he offered and sold to

investors at any given time along with the price at which these interests would be offered, which was referred to as a price per share. Additionally, the SP Fund Manager provided Hollender with marketing materials concerning the various companies that issued the Pre-IPO Shares.

40. For example, in February 2019, one of the owners of the SP Fund Manager sent Hollender a text message stating that because the SP Fund Manager would be buying Pre-IPO Shares of a certain company for $136 per share, the interests backed by the Pre-IPO Shares would need to be sold at a price of $150 per share to permit the SP Fund Manager to pay the 10 percent upfront fee to Hollender and for the SP Fund Manager to keep some profit for itself.

41. Nonetheless, and despite being paid a 10 percent upfront fee, Hollender told the investors he solicited on behalf of the SP Funds that there were no upfront fees and that the only way he or the SP Fund Manager earned any money was via Backend Fees.

42. Hollender knew or recklessly disregarded that these representations were false or misleading.

43. Additionally, these representations were important to actual and prospective investors in the SP Funds.

44. Hollender actively solicited investors on behalf of the SP Funds through telephone calls, emails, and Federal Express mailings. During these communications, Hollender provided investors with marketing materials, recommended particular Pre-IPO Shares, and told investors they would make high returns within a short time frame.

45. At times, Hollender was involved in negotiations between investors and the SP Fund Manager regarding the amount of Backend Fees.

46. While actively soliciting investors on behalf of the SP Funds, Hollender was not registered with the Commission as a broker-dealer or associated with a Commission-registered broker-dealer.

47. During Hollender's Work Period, the SP Funds paid Hollender, either individually or through GSH Empire, at least $1.8 million in upfront fees and Backend Fees for successfully soliciting at least $4.8 million in investments in the SP Funds from at least 43 investors.

### III. Migliano

48. Migliano solicited investors on behalf of the SP Funds from in or around March 2018 to in or around July 2021 ("Migliano's Work Period").

49. In or around March 15, 2018, Migliano entered into a written agreement with the SP Fund Manager that stated he would receive a "10 percent front end referral fee" for any investor in the SP Funds that Migliano successfully solicited (the "Migliano Agreement").

50. In practice, the SP Fund Manager also paid Migliano a 10 percent Backend Fee on all investments solicited by Migliano.

51. When Migliano began soliciting investors for the SP Funds, he worked at the SP Fund Manager's offices in lower Manhattan, where the SP Fund Manager provided Migliano with a desk, a computer, a phone, and leads.

52. From approximately March 15, 2018, through May 5, 2021, the SP Fund Manager also provided Migliano with an email address under the SP Fund Manager's email domain, which Migliano used to send and receive emails concerning his work for the SP Fund Manager. When Migliano sent emails from this email address, his signature block identified him as part of the "Private Client Group" at the SP Fund Manager and included the SP Fund Manager's lower Manhattan address and a New York phone number with a 646 area code.

53. The SP Fund Manager also provided Migliano with business cards that included the name and contact information for the SP Fund Manager.

54. In early 2020, Migliano stopped going to the SP Fund Manager's offices and continued to solicit investors in the SP Funds from his home. During that time, calls to Migliano's

11

phone number at the SP Fund Manager's offices were automatically forwarded to Migliano's personal cell phone.

55. Throughout Migliano's Work Period, the SP Fund Manager told Migliano which Pre-IPO Shares purportedly backed the interests in the SP Funds that he offered and sold to investors at any given time along with the price at which these interests would be offered. Additionally, the SP Fund Manager provided Migliano with marketing materials concerning the various companies that issued the Pre-IPO Shares.

56. Migliano actively solicited investors on behalf of the SP Funds through telephone calls, emails, and Federal Express mailings. During these communications, Migliano provided investors with marketing materials, recommended particular Pre-IPO Shares, and told investors they would make high returns within a short time frame.

57. In addition, despite being paid a 10 percent upfront fee, Migliano told the investors he solicited that the only way he or the SP Fund Manager earned any money was via Backend Fees. At other times, Migliano disclosed the Backend Fee that the SP Fund Manager charged to the investor, without disclosing the fact that he received a 10 percent upfront fee.

58. Migliano knew or recklessly disregarded that these representations were false or misleading.

59. Additionally, these representations were important to actual and prospective investors in the SP Funds.

60. While actively soliciting investors on behalf of the SP Funds, Migliano was not registered with the Commission as a broker-dealer or associated with a Commission-registered broker-dealer.

61. During Migliano's Work Period, the SP Fund Manager paid Migliano at least $1.5 million in upfront fees and Backend Fees for successfully soliciting at least $5.5 million in investments from at least 51 investors in the SP Funds.

**IV.  Vecchio and 21st Century**

62. Vecchio solicited investors on behalf of the SP Funds from in or around August 2018 through in or around November 2021 ("Vecchio's Work Period").

63. During Vecchio's Work Period, Vecchio worked in office spaces in and around Palm Beach County, Florida.

64. From at least in or around August 2018 through in or around March 2020, Vecchio communicated by phone with the SP Fund Manager and SP Adviser in lower Manhattan.

65. In or around February 2019, the SP Fund Manager printed business cards for Vecchio that included the SP Fund Manager's lower Manhattan address and a New York phone number with a 646 area code.

66. On or around August 6, 2018, 21st Century entered into a written agreement with the SP Fund Manager that stated that 21st Century would receive a "a front end referral fee of Ten Percent (10%) of any and all money or other consideration provided by [21st Century's] Customers" (the "Vecchio Agreement"). The Vecchio Agreement also stated that 21st Century would receive a 10 percent Backend Fee on "any and all money or other consideration provided by [21st Century's] Customers." Vecchio signed the Vecchio Agreement on behalf of 21st Century.

67. The SP Fund Manager paid Vecchio, through 21st Century, in accordance with the Vecchio Agreement.

68. From approximately October 4, 2018, through May 5, 2021, the SP Fund Manager also provided Vecchio with an email address under the SP Fund Manager's email domain, which Vecchio used to send and receive emails concerning his work for the SP Fund Manager. When

Vecchio sent emails from this email address, his signature block identified the SP Fund Manager's lower Manhattan address and a New York phone number with a 646 area code.

69. Throughout Vecchio's Work Period, the SP Fund Manager told Vecchio which Pre-IPO Shares purportedly backed the interests in the SP Funds that he offered and sold to investors at any given time along with the price at which these interests would be offered. Additionally, the SP Fund Manager provided Vecchio with marketing materials concerning the various companies that issued the Pre-IPO Shares.

70. Despite being paid 10 percent upfront fees, Vecchio told the investors he solicited on behalf of the SP Funds that there were no upfront fees and that the only way he or the SP Fund Manager earned any money was via Backend Fees.

71. Vecchio knew or recklessly disregarded that these representations were false or misleading.

72. Additionally, these representations were important to actual and prospective investors in the SP Funds.

73. During Vecchio's Work Period, Vecchio purchased leads from a marketing company. Vecchio cold-called these leads and solicited investments in the SP Funds from them. Vecchio also actively solicited investors on behalf of the SP Funds through emails and Federal Express mailings. During these communications, Vecchio provided investors with marketing materials, recommended particular Pre-IPO Shares, and told investors they would make high returns within a short time frame.

74. At times, Vecchio conducted negotiations between investors and the SP Fund Manager regarding the amount of Backend Fees.

75.	While actively soliciting investors on behalf of the SP Funds, Vecchio was not registered with the Commission as a broker-dealer or associated with a Commission-registered broker-dealer.

76.	During Vecchio's Work Period, the SP Funds paid Vecchio, through 21st Century, at least $479,000 in upfront fees and Backend Fees for successfully soliciting at least $2.7 million in investments from at least 21 investors in the SP Funds.

## TOLLING AGREEMENT

77.	On or around December 5, 2022, Hollender entered into a tolling agreement with the Commission.  The tolling agreement specifies a period of time (a "tolling period") in which "the running of any statute of limitations applicable to any action or proceeding against [Hollender] authorized, instituted, or brought by . . . the Commission . . . arising out of the [Commission's investigation of Hollender's conduct], including any sanctions or relief that may be imposed therein, is tolled and suspended . . . ."  The tolling agreement further provides that Hollender and any of his agents or attorneys "shall not include the tolling period in the calculation of the running of any statute of limitations or for any other time-related defense applicable to any proceeding, including any sanctions or relief that may be imposed therein, in asserting or relying upon any such time-related defenses."

78.	The tolling agreement tolled the running of any limitations period or any other time-related defenses alleged in this Complaint for a period of at least 90 days.

**FIRST CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)**
**(All Defendants)**

79. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 78.

80. Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

81. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**(All Defendants)**

82. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 78.

83. Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

84. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF
### Violations of Exchange Act Section 15(a)
### (All Defendants)

85. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 78.

86. Defendants, as natural persons not associated with a broker or dealer which is a person other than a natural person, made use of the mails or any means or instrumentality of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, any security without being registered with the Commission as a broker-dealer.

87. By reason of the foregoing, Defendants each violated, and, unless enjoined, will again violate Exchange Act Section 15(a) [15 U.S.C. § 78o(a)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)] and Exchange Act Sections 10(b) and 15(a) [15 U.S.C. §§ 78j(b) and 78o(a)] and Rules 10b-5(b) thereunder [17 C.F.R. §§ 240.10b-5(b)];

**II.**

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

**III.**

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

**IV.**

Ordering Relief Defendants GSH Empire and 21st Century to pay, with prejudgment interest, all ill-gotten gains by which they were unjustly enriched, under Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; and

**V.**

Granting any other and further relief this Court may deem just and proper.

**JURY DEMAND**

The Commission demands a trial by jury.

Dated: New York, New York
March 23, 2023

/s/ Antonia M. Apps
ANTONIA M. APPS
REGIONAL DIRECTOR
Sheldon L. Pollock
Steven G. Rawlings
Daniel Loss
Megan R. Genet
Tiantong Wen
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
(212) 336-5571 (Loss)
lossd@sec.gov